UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SEAN NEALY                                    )
3300 Sky Country Lane                         )
Apartment 203                                 )
Las Vegas, NV 89117                           )
                                              )
        Plaintiff,                            )
                                              )
        v.                                    )    CA No. _____
                                              )
KENNETH J. BRAITHWAITE                        )
Secretary of the Navy                         )
720 Kennan Street SE,                         )
Washington Navy Yard, DC 20374-5013           )
                                              )
        Defendant.                            )


## COMPLAINT

This is a non-monetary claim to set aside and remand to the Secretary of the Navy the

decision of 21 November 2017 to approve the recommendation of the Physical Disability Board of

Review #PD-2016-00401, of no change to Chief Petty Officer Nealy's 2008 medical separation at

10% disability for combined Depression and Post Traumatic Stress Disorder (not combat-related).

<u>Summary</u>

CPO Nealy was diagnosed in 2008 with PTSD and associated depression after over a 100

combat missions in Afghanistan and other undisclosed classified special forces' missions.  He was a

sensor operator in low-flying aircraft hovering over battle areas at several thousand feet often shot

at by enemy-converted anti-aircraft RPG missiles and ground fire (his two air medals require flying

in a hostile battle zone at risk of being shot down). CPO Nealy's duty was to identify targets, call in

air strikes against enemy soldiers using F15s, A-10, helicopter attack aircraft, or C130 gun ships.

He then used the sensor systems to zoom in within 15-20 feet to witness the carnage of mass

killings, often hundreds at a time, then count each individual dead for intelligence back-briefs, often

seeing bodies mutilated, torn apart distorted by aircraft bombs and gatling guns. Over the years his

missions he was personally responsible for thousands dead, had to count each body, with state-of-

the-art sensors providing up-close graphic vivid detail.   The final mission in 2006 —leading to PTSD, therapy, removal from flight status —involved calling air strikes to witness mass slaughter of nearly 200 Taliban, then counting individual bodies.

He was unable to perform any military duty; the Navy doctors at his Medical Evaluation Board (MEB) concluding he suffered from moderate to severe PTSD.  But the Physical Evaluation Board (PEB) composed of non-physicians line officers, determined Nealy had not met the criteria of PTSD absent documentation of a highly stressful event. The PEB, determined there was no mention of Nealy having felt his life was threatened or that he experienced intense fear or horror after witnessing a specific traumatic event.  Here, the PDBR was required to consider Nealy's later 2008 post-discharge Veterans Affairs decision that did find such documentation.

But the PDBR, like the earlier PEB in 2008, bypassed the VA finding, and speculated Nealy only suffered from a "moral injury," under a speculative story-line used generically in other cases. It is not in the record, but underscores this as an obsolete, antiquated view by hold outs of PTSD-deniers —

> his combat experience had affected him on a fundamental philosophical level whereas his assumptions regarding his purpose, the significance of his actions, the rationale for the war, and belief in his ability to perform his duties has been shattered.

In his initial 2006 Navy interviews CPO Nealy did come close verbally to, or just short of, expressing "horror" from the incident involving killing 180 enemy, that it was very upsetting and made Nealy angry.  This is discussed *infra* in this complaint. ¶ 31-35.  But ultimately in the Navy, and before the Navy MEP and PEB, he did not did NOT express any "fear and horror" nor allege shot at by RPG.  But the PEB and PDBR overlooked policy at the time.   In 2008 DoD and services agreed to a report on PTSD that found *stigma* and *training* in the military prevented or deterred members from reporting mental health symptoms, as well as relying temporarily on indirect ways in attempts to manage or rationalize their fear reactions.  This is exactly what happened, and why after leaving the Navy he reported horror and fear for his life.   The Navy must be presumed to know the law.  This is confirmed when DSM-5 (2013) at the urging of the military in 2012 dropped this

criteria for military members. The Army didn't wait for DSM in 2013 but in 2012 dropped this criteria.

Because the PDBR failed to consider stigma and training that deterred Nealy, as other service members, from reporting symptoms and indirectly attempting to rationalize his fear and horror, the case should be remanded for reconsideration.  Secondly, the case should be remanded when the PDBR failed to consider reporting of fear and horror to the VA after leaving the Navy.  Thirdly, the case should be remanded when the PDBR failed to consider evidence that Nealy reported to the VA he was shot at by anti-aircraft weapons, with additional confirmation submitted to the PDBR.


## JURISDICTION AND VENUE

Jurisdiction is conferred under the Administrative Procedure Act, U.S.C. § 702.

Venue is proper as the Defendant is found in this District.


## PARTIES

Plaintiff, Sean Nealy, is a former Chief Petty Officer in the Navy, grade E-6.

Defendant, Kenneth J. Braithwaite, in his capacity, is the  Secretary of the Navy.


## FACTS

1.  In 1996, Sean Nealy enlisted in the United States Navy.   His assigned specialities were in the Aviation Technician field (AT): Aviation Electronic Warfare Operator, EP-3E Electronic Warfare Operator, AT Instructor, AT Naval Aircrewman.  The Lockheed EP-3 aircraft is the signals reconnaissance version of the P-3 Orion aircraft.[1]

2.  From 2004 to early 2007 Petty Officer Nealy was assigned to VPU-2 Squadron.  He was the in-flight sensors operator for a specially configured and equipped P-3 Aircraft.  This unit is

---

[1] www.p3orion.nl.

one of two Navy VPU squadrons that are covert "Special Projects Squadrons tasked by JCS, COMPACFLT, Special Operations Command, to conduct world-wide high priority missions for reconnaissance, surveillance, and target acquisition." Ex. C 1-5, Nealy duty Evaluations (commands).[2]

3.   These undercover P-3 Orions are fitted with extra equipment below the fuselage with optical camera, electronic, chemical, and infra-red sensors.  They provide real-time transmission of Electrical Optical System images (EOS) to the sensor operator to personally target and call for air strikes by A10, F-16/18 aircraft, and C130 Gunships.  The sensors offer vivid, zoom capability to immediately witness close-in the damage and casualty assessments.[3]   The VPU sensors-suite with its specially configured P3 platform as part of a coordinated targeting-ordnance delivery system for covert, classified military missions, is an "instrumentality of war."

4.   The VPU sensor operator is unlike UAV or "drone" operators that are remotely located and physically removed from any battlefield danger.  VPU sensor operators, like Petty Officer Nealy, remain in harm's way flying at low altitude in the battlefield area, and encounter enemy opposition from anti-aircraft weapons, missiles, and ground fire.  Moreover, while the strike aircraft quickly departs the target area, the VPU aircraft hovers or loiters for longer periods over the target before and after, remaining  more exposed to enemy antiaircraft fire and surface to air missiles.

5.   From 2004 to 2007, P.O. Nealy was a VPU sensor operator in over 120 "combat missions" totaling over 800 flight hours, participating in operations in Afghanistan and Iraq.  Ex. C 1-6 (Evals).[4]   In former Petty Officer Nealy's own words —

> Much more than a drone operator....I was physically, directly over the 'action.'  My squadron, VPU-2, provided direct support (DS mission) for DevGru (Development Group or formerly known as Seal Team 6).  I operated advanced SAR (synthetic aperture radar) and other sensors, POS 18, providing imagery, infrared sensor and day-night camera (Wescam MX-15 video cameras).  I saw things live, with no delay and reported to other commands on

---

[2] The VPU Orion aircraft have no external characteristics to identify it as an intelligence gathering aircraft.

[3] http://www.p3orion.nl/sneaky.html.

[4] Exhbit number to PDRB.  Eval Oct 2004-Nov 2005 (missions classified); Eval Nov 2005-Nov 2006 (58 combat missions); Eval Nov 2006-Mar 2007 (61 combat missions).

the ground, or after-action reporting.  During one of my missions I witnessed the killing of 180 enemy combatants the first day, 360 killed for the week.  For the 180, I was watching it happen while I called two A-10 Warthogs to eliminate them all and recording as it happened and watching later and counting one by one.  As an Aircrewman, I flew in the special projects squadron P-3 with the sensors mounted on and in it while operating the equipment, often while being shot at, and several times with RPGs.

Nealy Personal Statement to PDBR. Verified in Navy health records. Ex. E2, 29, 32; Ex. A 15-16.

Nealy said with zoom optics and image enhancements he saw facial features, beards, eye glasses.

5A.  Using RPGs as improvised anti-aircraft batteries has proved successful in Somalia, Afghanistan and Chechnya. The weapon is modified by adding a curved pipe to the rear of the launcher tube, which diverts the backblast, allowing the RPG to be fired upward at aircraft from a prone position.[5]

6.  As a result of these combat missions, Petty Officer Nealy was awarded two Air Medals. Ex. B 1 (DD 214, "Air Medals(2)...Afghanistan Campaign Medal, Iraq Campaign Medal.").

7.  Each Navy Air Medal requires 50 combat missions, such as "target combat air patrol." Necessary to the award, the mission must "encounter enemy opposition."  This enemy opposition may include ground fire, anti-aircraft artillery, surface to air missiles, and that is "equivalent against strike aircraft."  SECANAVINST 1650.1G ¶ 11 (Strike/Flight subcategory "direct combat support mission");  see also Nealy Evals. Ex  C 2, 4 ("execution of 61 combat missions...supporting [OEF] * * * execution of 58 combat missions...support of [OEF, OIF]").  In addition, Nealy specifically recalls missions his aircraft was attacked by antiaircraft missiles, including enemy ground fire.  see also Exhibit A 16,17 ("subjected to RPG attacks").  As a result, Nealy as the VPU sensor operator, who was shot at, awarded 2 air medals for over 120 combat missions "encountering enemy opposition" — is distinguishable from drone operators or UAV Pilots remotely located from battlefield danger.

8.  2015: Pentagon declines combat medal for drone pilots.  In 2013 the DoD secretary proposed this combat medal.  DoD had been struggling with adapting to the changing realities of

---

[5]https://en.wikipedia.org/wiki/Rocket-propelled_grenade

modern warfare, where personnel effect the outcome of combat operations dramatically without ever really being where that war is taking place.  Drone warfare is one area that has struggled to adapt culturally.  Others include cyber warfare specialists and other non-combat but essential "virtual warfare" personnel who have had an extraordinary impact on combat operations, "but were not physically in a combat theater."  This soon became mired in controversy.  It became nicknamed the "Nintendo Medal" in degrading fashion. Eventually DoD approved an "R" device, as in "remote," pinned to existing non-combat medals, such as the Meritorious Service Medal.[6]

9.   <u>Sept - Nov 2006: Chief Petty Officer Nealy grounded for Acute PTSD</u>. In September 2006 he sought out his flight surgeon stating "I was not feeling like myself."  He was referred mental health treatment.  This was about 6 weeks after a combat mission where he encountered enemy attacks, targeted then called for strikes, witnessed over 180 enemy combatants die on 1 bombing raid, and he was required to count the enemy casualties.  Due to the zoom and image sensitivity of his sensor equipment within 50 meters, he saw the graphic carnage of the bombing. As set froth above, Nealy recalled —

For the 180, I was watching it happen while I called two A-10 Warthogs to eliminate them all and recording as it happened and watching later and counting one [them] by one.

10.   On 22 Sept 2006, a mental health exam found significant PTSD symptoms, to include, difficulty concentrating, hyper-vigilance, avoidance of talking or recalling deployment missions, nightmares, recurring memories and intrusive thoughts 3x times weekly, poor sleep, crying spells, lack of motivation.  He was grounded to begin treatment for Acute PTSD.  Ex. G 44-45; Ex. E 2.

11.   From September to November 2006 his GAF scores dropped from 70 to 51.  Symptoms worsened, to include exaggerated startle response, extreme anger, losing 15 pounds in 3 months, later suffering from depression.  The Acute (temporary) PTSD was changed to Chronic PTSD.  Ex. G 36-41.

---

[6] "*Pentagon Bails On Controversial 'Nintendo Medal' For Drone Pilots*" 4 Oct 2015, www.militarytimes.com; <u>and</u> http://www.follownews.com/pentagon-bails-on-controversial-nintendo-medal-for-drone-pilots-m84f

12.   Medical entries repeatedly state "risk/vulnerability" to PTSD was "combat experiences" or "combat exposure."   Ex. E 2, 5 (combat experiences); Ex. G 4, 8, 10 (combat exposure).  These entail:  (1) threats of serious injury/endangerment to aircrew as part of combat missions (awarded 2 air medals),  (2) actually being often shot at by the enemy, thus heightening personal awareness of threats; (3) sensor operator was over the battlefield repeatedly targeting the enemy, witnessing and verifying their deaths.

13.   In January 2007 a LIMDU board placed Nealy on medical hold. Ex. G 34.  He was found not physically qualified for all duty involving flying due to PTSD.  Ex. G24.  He tried PTSD and sleep medications, but the side effects were intolerable.  And  PTSD psychotherapy.

14.  Second limdu trial: *impairment failed to improve in part-time admin duties, kept stress-free*.  While in limdu status, he continued with weekly psychotherapy.  He was thus assigned to part-time administrative duties, and also conditions artificially created – under "restriction of ensuring a stress-free environment."  Ex, F 2 ¶ 3.  In this restricted, part-time administrative 'bubble' some symptoms appeared to slowly improve.  Ex. G 7.  But this is misleading.  The command assessment implied this "bubble' was unrealistic in the military duty context, basically making Nealy unfit, so "he is not recommended for continued service."  Id. ¶ 3, and see ¶ 2.*o* (also not recommended for permanent limdu status).  To confirm, during this limdu status (despite treatment, therapy, and restricted stress-free environment), his GAF scores for military duty *did not improve*, remaining moderate impairment 51-60.  Ex. E4; Ex. G4, 8, 10.  Consequently, the psychologist recommended plan was "initiate PEB." Ex. G 4.  Lastly, the MEB in April 2008 found "he will likely require ongoing psychotherapy following discharge."   This confirmed limits to full-time work.  Ex. E 4.

15.   ***MEB****: in the military severe impairment from PTSD, and moderate from depression.*  As set forth above, in April 2008 the MEB confirmed primary diagnosis PTSD.  The MEB found that the depression was secondary to the PTSD, arising later from the mental strain "ruminating" on his "existential crisis"over a sense of self, meaning in life, and purpose in the military. Ex. E 2, 4.

He was unfit because military impairments from PTSD would be exacerbated/triggered to "severe" with depression to "moderate" if he continued in the military "in all situations."  Ex. E 2 (context); Ex. E 4 (military impairments).  The exacerbation and triggering symptoms would not be 'ruminating' thoughts over an existential crisis, but severe PTSD symptoms of: intrusive combat memories/nightmares of the carnage of death and destruction of the bombing, and physiological anxiety (increased heart rate, muscle tension, nausea, sweating, freezing, zoning out), anger/irritability, numbness hyper-vigilance, insomnia.

16.  **_PEB_**: *misled, inaccurate or confused: unfitting 10% depression with unfitting PTSD.* The PEB apparently was misled by Nealy's improvement in some symptoms while in limdu status. But this was part-time, administrative duties, in a contrived, unrealistic "stress-free" bubble that attempted to isolate the military context.  As such, his attending psychologists (and MEB) did not find improvement in GAF military impairment — which if returned to duty would be exacerbated or triggered to severe PTSD (70%), and moderate depression (50%).

17.  The PEB dissenting minority opinion found no unfitting PTSD/depression.  It implies Nealy is a *mentally* disturbed conscientious objector to causing death and destruction, not *physically* disabled. This suggests the PEB majority may have at least downplayed severe impairment from PTSD by confusing it as distressing "moral injury" versus as symptoms of physical disability.[7]

18.  Downplaying or confusing PTSD impairment as a "moral injury" not a physical disability, also misinterprets the MEB and record.  As a result of psychological and physiological symptoms of severe PTSD – the intrusive combat memories and nightmares, increased heart rate, muscle tension, nausea, sweating, freezing, anger/irritability, numbness hyper-vigilance, etc – these later prompted an intelligent Petty Officer to intellectualize his disability searching for meaning "on a fundamental philosophical level."  Ex. E 2.  This caused serious depression.  Nealy did not get PTSD from a moral, existential crisis, but from meeting the DSM criteria.  And continuing military

---

[7] See  S. Maguen, B.  Litz, *Moral Injury in the Context of War,* National Center of PTSD (shame, guilt, anger or anxiety from betrayal, are manifestations separate from PTSD); and see B. Litz, *et.al*, *Moral Injury and Moral Repair in War Veterans: preliminary model for intervention*, National Center of PTSD, VA Health Center, Boston, Clin. Psych.Rev. (Dec 2009)(moral injury distinguished from PTSD) http://www.ptsd.va.gov/professional/ co-occurring/moral_injury_at_war.asp)(accessed June 2016).

service in all situations will exacerbate or trigger severe PTSD symptoms of psychological and physiological impairment.

19. It is noteworthy, that the minority opinion is from a non-medical Marine line officer. It is appallingly derisive – "don't see any **real** combat here...imagery aircraft not directly in combat and not directly threatened." Ex. D 2 [italics added]. It is a condescending mockery of Nealy's air medals, 120 combat missions (where the Navy determined he encountered enemy opposition from anti-aircraft fire), that placed him in harm's way with real threat of injury, was actually shot at, and on a repeated basis targeted then witnessed 'zoomed-in' the mass slaughter of hundreds of people and the physical carnage of bombing, and finally while loitering over the target area still encountering threats of enemy anti-air opposition to count each dead body one-by-one. Under the facts of this case, the PTSD criteria under DSM IV-TR and DSM-5, the Marine's opinion here slanders the advances in military psychiatric medicine. It also perpetuates the old-school, machismo that only ground warriors get PTSD by tangling in the dirt with an enemy at arms-length.

20. Nealy was discharged in August 2008, 10% rating and severance. Although the pay was "not paid," apparently offset by the VA 30% disability compensation. Ex. B.

21. **VA 30% PTSD; no diagnosis for Major Depressive Disorder.** The 2009 VA 30% rating for PTSD confirmed that impairment while *in the* Navy would remain severe (70%) to moderate (50%0), so that ending military service lessened impairment to mild 30% PTSD social/occupational impairment, improved GAF of 70 (occasional/periodic decrease in work efficiency and inability to perform occupational tasks). Likewise, no longer in the military without the "existential crisis"over his purpose, symptoms of his major depressive episode had ebbed. The VA found no continuation of major depressive symptoms, or alternatively subsumed the symptoms within the overall PTSD diagnosis.

22. **PTSD was caused by using an instrumentality of war**. As set forth above, the VPU additional sensor-suite and covert P3 platform are specially configured for the classified target acquisition/strike missions. These are a unique sensor-targeting package (unlike civilian sensors) part of a weapon system chain for covert special operations. He was diagnosed with PTSD as a

direct result of repeatedly operating the sensors to identify, target, coordinate strikes, and assess the casualties.

23. ***Unfitting separations for PTSD rated at 50%***.   Regardless of the VA 30% rating, the DoD policy is that unfitting separations for PTSD after 28 Jan 2008 require 50% PTSD military disability rating. DoDI 6040.44 Encl(3)4f.(1).

24.   PDBR agreed with the Navy 2008 PEB, and did not recognize PTSD as separately unfitting nor qualifying as a diagnosis. The PDBR was to apply VASRD (38 CFR 41.29) that the PTSD in-service causing separation was from "a highly stressful event." They looked at DSM-4 (mental health manual) in effect at time. Nealy did report all the mental symptoms of PTSD. However to qualify as PTSD there is a further objective/subjective requirement that exposure to trauma (as a sensor operator) the patient express "fear" from threats to your safety or others, and "horror" at the massive killing of enemy Taliban. As set forth below, this is first factually inaccurate. Second their warped view of who PTSD is presented relies on an obsolete holdover opinion of past PTSD-deniers PTSD in the military, hardliners who never accepted that service members can get sick just doing their jobs.  These crusty PTSD deniers look for any excuse to shoot down a diagnosis portraying the alleged trauma as a close cousin to malingering, or with euphuism "moral injury" and no spine for military life. so it will get better over time.

25.   For example, the MEB and PEB found in past records Nealy did NOT express "fear and horror" (nor did you allege being shot at by RPGs). In sum, they were "unable to locate any documentation of a highly stressful event." Instead they said you

> were affected by combat experience on the fundamental philosophical level.. .. purpose, significance of his actions and rationale for the war, and belief in ability to perform his duties has been shattered.

In other words, the Navy did not find you qualified for PTSD in 2008 under then DSM-4 as you did not experience "a highly stressful event."

26.   Firstly, the lack of documentation is incorrect. The VA findings must be considered. The  PDBR failed to consider them or overlooked them for the PTSD (put blinders on). The VA in 2008 shortly after Navy separation did FIND Neal qualified for separate diagnosis of PTSD. In.

the V A's C&P examination, it states that during Nealy's missions "were shot at by RPGs, and expressed fear and horror." Secondly, in his service record, this is corroborated as he received Navy air medals for combat duty which requires "exposure to hostile enemy opposition or antiaircraft weapons." And the missions were all verified, nor disputed that he did witness the massive killing of enemy Taliban. Thirdly, in the legal brief to that PDBR it was cited.

27.  Documentation of Taliban retrofitting RPG as antiaircraft weapons. Fourthly, in his initial 2006Navy interviews Nealy did come close verbally to, or just short of, expressing "horror" from the incident involving killing 180 enemy, that it was very upsetting and made Nealy angry. But ultimately in the Navy, and before the Navy MEP and PEB, he did not did NOT express any "fear and horror" nor allege shot at by RPG. Both are red herrings.

27A.  The PDBR failed to consider or overlooked the VA finding of fear and horror, in the C&P exam. So how does the Navy explain why Nealy did not express this *in the Navy*? The answer is simple. They just ignored this conflict.   But they also ignored the glaring evidence of DoD policy that members are trained to suppress fear and horror, or do not report the full extent of symptoms due to career stigma that will affect their jobs, and career. Although the 2013 DSM 5 dropped this extra requirement for professions such as military and first responders, the DoD policy was in effect in 2008.  In 2006 at the time Nealy reported distress at the incident of mass killing of Taliban, the record shows he also expressed concern about removal from flight status.

28.  Because of under reporting PTSD symptoms by service members was a concern, in 2006 Congress ordered DoD to study stigma in the military -- if it prevents accurate reporting of symptoms and diagnosis of mental health conditions, including PTSD. This was completed in 2007 and in 2008 before Nealy was separated, DoD agreed to the report findings that *stigma and training* in the military prevented or deterred members from reporting mental health symptoms. This is essentially the DOD policy at the time in 2008.

29.  The DoD Policy in 2008 that stigma and training prevented military members form reporting mental symptoms, was used to influence DSM-V in 2013 to drop "the fear and horror"

criteria from PTSD.   This was first described in an Army MEDCOM Policy Memo 2012 that did

not wait for DSM-V:

[c]   DSM-IV-TR is well over a decade old, and is currently undergoing revision. There is considerable new evidence that certain aspects of the definition are not adequate for individuals working in military and other first responder occupations. In particular, the A2 criterion has been shown to be inadequate in defining the response to trauma for SMs and other first responders (e.g., police, firefighters), who undergo rigorous training in how to respond to multiple traumatic events as part of their occupations...*They often do not endorse "fear, helplessness, or horror,*" the typical response of civilian victims to random traumatic events. although they may *experience fear internally if they are trained to fall back* on their training skills, may have other responses such as anger, or may express helplessness *in less direct ways*, such as frustration with rules of engagement or leadership decisions over which they had no control that put them in dangerous situations. As a result, the DSM-V committee has recommended removal of the A2 criterion. * * *

[g].  The majority of SMs with PTSD do not seek treatment, and many who do seek treatment drop out before they can benefit .........There are many reasons for this, including stigma, other barriers to care, and negative perceptions on their career, of mental healthcare.  Lack of trust in military BH professionals......Therefore, itis critical that Army BH professionals do everything they can to advocate for and provide care in a patient-centered manner....*it is well known that many SMs refrain from getting needed treatment in an effort to avoid interfering in some way with their careers* until symptoms become overwhelming, or they face significant stressors * * *

POLICY. ....in diagnosing PTSD...If a Soldier, for example, meets all of the...criteria for PTSD ....but does not meet the A2 criterion (response to the trauma of "fear, helplessness, or horror"), clinicians should strongly consider making a PTSD diagnosis......

Army MEDCOM Policy Mem April 2012 ¶ 6c, 7b [italics added].[8]

30. The 2017 Hagel Policy Memorandum Clarifying applying "liberal evidence principles"

to upgrades/appeal to prior adverse discharges, requires the service discharge and corrections

boards- and the PDBR-as their regulatory corollary,[9] to apply current science and science-based

discharge policies retroactively.[10]  Because applicants may choose either a correction board or the

PDRB for the same relief, it is inequitable for the 2017 Hagel Policy to apply to the former but not

---

[8] https://cdn.govexec.com/media/gbc/docs/pdfs_edit/042312bb1.pdf

[9] The PDBR is in effect a temporary subset, limited appeal board of the services primary "correction boards," as the remedy is available at both.  *Dignified Treatment of Wounded Warriors Act* in January 2008; 10 U.S.C.Chap 79 *Correction of Records*, § 1554a; DoD Instruction 6040.44 (2015)(applicants may opt instead of correction board; PDBR limited to  medically dischargees between 2001 and 2009 at less than 30%).

[10] See. BCNR No 2857-20 (4 Nov 2020)(applied 2017 Hagel Policy to evaluate claim for full retirement from  2008 discharge).

the latter.[11] In any event, it was DoD policy in 2008 that *stigma* and *training* in the military prevented or deterred members from reporting PTSD symptoms.

31.   In a 22 September 2006 medical entry, when CPO Nealy first approached his flight surgeon, he did not mention PTSD.  Rather he stated "I was not feeling like myself...shared this with my flight surgeon."  He then expressed increasing anger regarding witnessing to 180 killing in a single night due to his sensors and  bombing.  He only wanted to sort this out, and return to his unit stating "he does not want to be a liability for his unit and wants to be able to make sense of his experiences."

32.  In  22 October 2006 medical entry, after CPO Nealy reported that he was then "downed" for the current and next deployment.  He was "experiencing some guilt over his buddies picking up the slack."   Another medical entry 24 October still indicates he wants to return to his unit, in that he is "open to medications" but only if cleared first by his flight surgeon.

33.  It was not until December in 2006 in January 2007 that CPO Nealy in therapy began developing an idea of changing his philosophy and political views on the War on Terrorism and his role in it. These ideas made him feel "less lost."

34.  Finally, in 11 March 2008, while PTSD therapy, he was asked to explore his combat experiences—

> The patient conveyed shattering of his political views of the war, mission and his part in the war patient voiced love losing a sense of who he is and what his life means in context of war in trying to reconceptualize his sense of self post-deployment.

35.  In the context of his later post-discharge VA statements to his fear, and being shot at by anti-craft, CPO Nealy 2008 while in the Navy expressed initial reluctance and tentative responses above to medical authorities after his deployments. This a classic example of what the Army medical policy acknowledged in 2012, and of the criteria was dropped from DSM 5 - that servicemembers due to impact on career or their unit, and stigma associated with his feelings, don't

---

[11] DoD Instruction 6040.44 (2015)("PDBR has no greater obligation to wounded, ill, and injured former Service members than to offer fair and equitable recommendations pertaining to the assignment of disability ratings."); Moreover, the 2017 Hagel Policy applies to the plural *"Boards* for Correction of Records" with the PDBR a subset under Chapter 79 *Correction of records*, at §1554 along with BCMR at § 1552.

want to become a liability to their unit, and feel guilt; they are hesitant to express the full extent of their thoughts on trauma.  Secondly, they do not endorse helplessness or horror, rather they fall back on their training, here the educated and intelligent Nealy unconsciously resorted to *indirect means* — a rationalization criticizing the war, political leadership, and own sense of self-worth— in an attempt to deal with PTSD symptoms.

36.   In 2008 the Navy and PDBR exploited the very training CPO Nealy expertly put into practice, to not express fear and avoid the stigma of PTSD that becomes a unit liability. The military turned the tables and used this training against him to deny a fair disability process.  When he did seek disability they insulted him claiming only "a moral injury."  This insult is an example of the stigma barrier to seeking help that DoD acknowledged in 2008.  "Why even explore my symptoms if twisted to paint me as third-rate warrior...then I receive no disability?"

36A.   The Navy and PDRBR were also operating under antiquated ideas that fell short of today's PTSD science,  particularly under the Hagel policy of 2017.  And despite reporting horror and fear to the VA, the PDBR relied on the same debunked policies when it failed to reconcile this under 2008 DoD warning over career-stigma of mental health (and congressional concern).  Instead the Navy and PDBR cherry picked to overlook inconvenient findings.

37.   The PDBR  failure to address these non-frivolous issues was arbitrary and capricious agency action.

38.    In 2020, plaintiff files the present civil action seeking judicial review under the Administrative Procedure Act, of the Secretary's decision approving the PDBR recommendation, as as arbitrary and capricious agency action.


CAUSE OF ACTION

That the 2017  Secretary's decision approving the PDBR recommendation denying plaintiff relief, violated the Administrative Procedure Act as an arbitrary and capricious agency action.

PRAYER FOR RELIEF

That this Honorable Court declare that the Secretary's decision  was arbitrary and capricious agency action.

That the Court order a remand of this case to the Secretary to reconsider its 2017 decision.

That this Honorable Court grant attorney fees.


Respectfully Submitted,




a/s
John Wickham
DC Bar 454863
32975 Saint Moritz Drive
Evergreen, CO 80439
303 670-3825 fax: 303 670-1586
wickham1@wispertel.net

Counsel for Plaintiff Sean Nealy